IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

        Plaintiff,

vs.                                             Crim. No. 12-163 MCA

GAVIN YEPA,

        Defendant.

## ORDER ON REMAND

This matter is before the Court upon the Mandate of the Tenth Circuit Court of Appeals entered in *United States v. Yepa*, No. 13-2149 (August 7, 2014).  The Court conducted an evidentiary hearing on September 15-16, 2014. The Court has considered the record in this case; the evidence tendered by the parties at the evidentiary hearing; the briefs of the parties; and the applicable law, including the Order and Judgment of the Court of Appeals; and is otherwise fully advised.

**DISCUSSION**

The Court of Appeals has instructed the Court to "conduct a plenary hearing, make specific findings regarding each of the *Wicker* factors, and issue a clearly articulated decision properly balancing competing interests."  The *Wicker*[1] factors include:  (1) the reasons for the delay in disclosing the evidence;  (2) prejudice to the opposing party;  and  (3) the feasibility of curing the prejudice to the opposing party with a continuance.  *United States v. Adams*, 271 F.3d

---

[1] *United States v. Wicker*, 848 F.2d 1059, 1061 (10th Cir. 1988).

1236, 1243-44 (10th Cir. 2001).  The Court recognizes that these factors are non-exclusive, and

"merely guide" a district court in exercising its broad discretion.  *United States v. Russell*, 109

F.3d 1503, 1511 (10th Cir. 1997).  Although a court should impose the least severe sanction that

will accomplish prompt and full compliance with its discovery orders, "[a] remedy that does not

maintain [the court's] integrity and schedule does not accomplish . . .  'prompt and full

compliance with the court's discovery orders.'" *Russell*, 109 F.3d at 1512.

　　　The United States argues that the Court should apply the second and third *Wicker* factors

to the circumstances as they exist post-appeal. [Doc. 194 at 1 (arguing that the passage of time

during the interlocutory appeal process cured any prejudice to the defense); *Id*. at 23 (arguing

that "the proper point in time to determine prejudice to Defendant is now")] The Court rejects the

United States' proposed approach. *Wicker*, like the present case, involved an interlocutory appeal

by the United States from an order excluding evidence.  The Court of Appeals applied its newly-

adopted factors to the circumstances that confronted the district court at the time it ordered the

exclusion of the evidence. *Wicker*, 848 F.2d at 1061-62. Consistent with the Court of Appeals'

approach in *Wicker* itself, the Court will apply *Wicker* to the circumstances as they existed on

August 11, 2013, the date the Court entered its Order excluding the 911 recording for the

scheduled August 14, 2013 trial.

　　　**The following discussion sets forth the Court's findings of fact and conclusions of**

**law.**

**1.　　*Wicker* Applies to the United States' Violations of the Court's Scheduling Order**

　　　The United States did not have physical possession of the 911 recording until June 2013,

at which time the United States promptly provided it to the defense.  The Court agrees with the

United States [Doc. 118 at 20]  that it complied with Rule 16(c) with respect to the 911 recording

by promptly disclosing the 911 recording once the United States obtained physical possession of the recording. *See United States v. Levitt*, No. 98-2353, 1999 WL 996997 *3 (10th Cir. Nov. 3 1999) (unpublished decision) (rejecting defendant's Rule 16 argument; observing that evidence was not in the government's possession, custody or control); *see generally* 2 Chas. Alan Wright, et al., *Fed. Prac. & Proc.* § 254 n. 12 (collecting cases) (4th ed.). Thus, there is no violation of the *disclosure* obligations imposed by Rule 16 to support sanctions under Rule 16(d). However, there is no question that the *designation* of the 911 recording on August 7, 2013 violated the Court's Scheduling Order. The Court of Appeals has held that *Wicker* applies to untimely disclosures and designations not expressly governed by Rule 16. *Russell*, 109 F.3d at 1511 ("*Wicker* was a Rule 16 case. This one is not. But *Wicker* is a satisfactory precedent to deal with violations of orders requiring pretrial disclosure of witnesses."); *United States v. Red Elk*, 185 Fed. Appx. 716 (10th Cir. 2006) (applying *Wicker* to district court's exclusion of evidence as remedy for government's violation of court's scheduling order).

As the violating party, the United States bore the burden of explaining its failure to designate the 911 well beyond the deadlines set by the Court. *Russell*, 109 F.3d at 1511 ("Since [Defendant] was the violating party seeking to avoid the sanction, the burden was on [Defendant] to explain the failure to produce [the defense witness].").

**2.      The United States' Reasons for Disclosing the 911 Call on the Eve of Trial**

On the evening of December 28, 2011, Lynette Becenti made two calls on her cellphone to the residence of her boyfriend, Tom Collateta. [Tr. at 69][2] Mr. Collateta was not home, having been arrested earlier that day for fighting with his brother. [Tr. at 69]  Both calls were captured

---

[2] This Order refers to two transcripts:  the transcript of the September 15-16, 2014 evidentiary hearing after remand [Docs. 191-192] and the transcript of the August 8, 2013 final pretrial hearing [Doc. 138].  All references to a transcript, except those expressly designating the transcript of the August 8, 2013 hearing, are to the transcript of the September 2014 evidentiary hearing.

by Mr. Collateta's caller ID. [Tr. at 71]  No one answered the first call. Mr. Collateta's sister answered the second call and briefly spoke with Ms. Becenti. [Tr. at 503]

Witnesses recall dropping off Ms. Becenti and Defendant at his home on the evening of December 28, 2011.

At approximately 9:23 p.m. on December 28, 2011, a woman called the Sandoval County Regional Emergency Communications Center (hereafter "SCRECC").  The conversation between the caller and the 911 operator was recorded automatically.  The caller clearly was intoxicated.  She was unable to identify herself or the location from which she was calling.  The recording [Ex. 1] appears to capture in real time a sexual assault upon the caller by a male whose voice can be heard in the background.

Shortly before midnight on the evening December 28, 2011, Defendant, in an intoxicated and disheveled state, contacted tribal officials to report that there was a woman in his home who was not breathing. [Doc. 1 at 3, 4; Tr. at 33; Ex. E]  Upon entering Defendant's home, the responding tribal officials discovered the body of a woman, later identified as Ms. Becenti. Tribal official Clint Sando phoned the SCRECC.  The SCRECC dispatched an ambulance and contacted the Jemez Pueblo Police Department (hereafter "JPPD").  The JPPD responded, securing the crime scene. [Tr. at 546]  JPPD Chief Mike Toya contacted the FBI. [Tr. at 546; 555-56]  An FBI Evidence Recovery Team, led by case agent, S.A. Ben Bourgeois, was on the scene shortly after 2:00 a.m. on the morning of December 29, 2011. [Tr. at 427] The FBI completed its investigation of the crime scene around 11:00 a.m., December 29, 2011.  [Tr. at 431]

By December 29, 2011, the JPPD had associated the Becenti homicide with three 911 calls made to the SCRECC on the evening of December 28, 2011. [Exs. 13-15] On December 29,

4

2011, the JPPD provided Agent Bourgeois with printed copies of the Computer Assisted

Dispatch (hereafter "CAD") reports of the three calls. [Tr. at 493; Ex.12] The first CAD

report concerned a 911 call relating to Ms. Becenti's boyfriend, Tom Collateta. [Ex. 13] The

second CAD report was the report of the 9:23 p.m. 911 call. [Ex.14] This CAD report included

the caller's phone number, but did not identify the caller by name. The third CAD report was the

report of tribal official Clint Sando's 911 call reporting an "unresponsive female." [Ex. 15]

Agent Bourgeois did not consider the information in the CAD reports to be a priority. [Tr. at

432] It did not occur to him to ask why the JPPD had associated these three CAD reports with

the Becenti homicide. [Tr. at 495-96] The CAD reports were filed and thereafter apparently

forgotten by Agent Bourgeois.

By the early morning of December 30, 2011, the JPPD had connected Jemez Pueblo

member Rodney Adams to the homicide. During the evening of December 29, 2011, Adams

appeared at the JPPD in an intoxicated and emotionally unstable state. [Tr. at 232] When JPPD

Officer Gary Tafoya attempted to speak to Adams, Adams became confrontational, and the

encounter ended with Officer Tafoya arresting Adams. [Tr. at 233] During the arrest, Adams

acquired a "goose egg" on his face. [Tr. at 233] When the Sandoval County Detention Center

(hereafter "SCDC") refused to book Adams without prior medical clearance of his injury, [Tr. at

233] Officer Tafoya took Adams to a local hospital. [Tr. at 237] While Officer Tafoya and

Adams were alone in an examination room, Adams began talking about having been present in

Defendant's home as Defendant sexually assaulted a woman. [Tr. at 242] Officer Tafoya

decided to record the statement on his digital belt recorder. Officer Tafoya interrupted the

statement to phone Chief Toya to tell him that Adams was giving a statement and that Tafoya

was recording it. [Tr. at 242-43, 279-80] During his statement, Adams admitted taking the

victim's cellphone from her purse or bag[3] and described the location where he later abandoned it during the morning of December 29, 2011. [Tr. at 243-44] After Adams was examined at the hospital, Officer Tafoya took Adams to the SCDC for booking.  Officer Tafoya phoned Chief Toya to tell him about Adams' statement and to let Chief Toya know that Tafoya intended to go to the location described by Adams to look for the phone.  [Tr. at 245]

Sometime around 3:00 a.m. on December 30, 2011, Officer Tafoya, aided by JPPD Officer Jordan Shendo, went to the location described by Adams and recovered the cellphone. [Tr. at 245-46, 282] Officer Tafoya phoned Chief Toya to tell him that he and Officer Shendo had recovered the cellphone. [Tr. at 253, 287]

During his next shift, Officer Tafoya prepared a Uniform Incident Report describing his encounter with Adams and the subsequent arrest. [Tr. 234, at 267; Ex. 26]  This report was assigned CAD number 113630651. [Ex. 26]  Officer Tafoya also prepared a Supplemental Report in which he summarized the circumstances leading to Adams' statement, the substance of Adams' statement, and his and Officer Shendo's recovery of the cellphone. [Ex. 34] In his Supplemental Report, Officer Tafoya referenced the CAD number of the Becenti homicide, 113620616.[4] [Ex. 15] Consistent with standard procedure, Officer Tafoya placed the Report and the Supplemental Report in a box on Chief Toya's office door [Tr. at 234, 251]. Officer Tafoya logged the recording of Adams' statement and the cellphone into evidence.  He attached one copy of the Property Inventory/Evidence Form for the cellphone [Ex. 31] and one copy of the Property Inventory/Evidence Form for the recording of Adams' statement [Ex. 32] to the

---

[3] Adams' statement that he found the victim's cellphone in her purse or bag presents the perplexing question of how the victim's cellphone found its way into her purse or bag following the sexual assault captured in the recording of the 9:23 p.m. 911 call.

[4] This CAD number, 113620616,  is the CAD number assigned to Jemez Pueblo tribal official Clint Sando's  911 call reporting an "unresponsive female." [Doc. 15]

Supplemental Report. [Tr. at 350]  Each form references the CAD number for the Becenti homicide.

Officer Tafoya's Report and Supplemental Report were prepared on forms that contain a space for the signature of the "approving supervisor."  The practice at the JPPD was for Chief Toya to review reports prepared by JPPD personnel, sign them to indicate his approval, and then give them to his administrative assistant, who would  hand file them by the next day. [Tr. at 215] All subsequent reports relating to a given case were filed in the folder for the month in which the original report for the case had been filed. [Tr. at 215-18, 221] If two or more reports were clipped together when presented for filing, the practice of the administrative assistant was to file them as a single unit, without separating them. [Tr. at 216, 221-22] Chief Toya's initials and the date "12-31-11" appear on the Report of Adams' arrest, [Ex. 26] but not on the Supplemental Report. [Ex.34] At the evidentiary hearing, Chief Toya had no present recollection of having reviewed the Supplemental Report. [Tr. at 565]   It is more likely than not that Chief Toya gave both the Report and the unapproved Supplemental Report clipped together to his administrative assistant, who unknowingly filed the Supplemental Report along with the Report of Adams' arrest, placing them in the file for December 2011.

Sometime on December 30, 2011, Agent Bourgeois swore out an Affidavit in support of a criminal complaint. [Doc. 1]  As of that date, Agent Bourgeois had not interviewed Adams or spoken with Officer Tafoya or Officer Shendo.  [Tr. at 433, 499]  In preparing the Affidavit Agent Bourgeois relied in part on information provided by Chief Toya. [Tr. 433] Paragraph 12 of the Affidavit contains information about the homicide and the theft of the cellphone that could have come only from Adams, and information about the recovery of the cellphone that could have come only from Officer Tafoya or Officer Shendo.  Since Agent Bourgeois had no contact

with these officers prior to preparing his affidavit, Agent Bourgeois must have relied on information provided by Chief Toya that Chief Toya in turn had obtained from Officer Tafoya's oral reports.[5]

In the last sentence of paragraph 12 of his Affidavit, Agent Bourgeois states that "Adams led JPD officers to where he had disposed of the cellular phone." [Doc. 1 at 6]. This statement is equivocal as to whether the JPPD recovered the phone. While it does not make sense for Chief Toya to have told Agent Bourgeois that JPPD officers went to the location where Adams abandoned the victim's phone without also mentioning that the officers recovered the phone, Chief Toya did not recall telling Agent Bourgeois that the phone had actually been recovered and Agent Bourgeois did not recall being told by Chief Toya that the phone had been recovered. It is possible that Agent Bourgeois spoke to Chief Toya after Officer Tafoya told Chief Toya that he was going to look for the phone at the location described by Adams, but before Officer Tafoya called back to tell Chief Toya that he had recovered the cellphone. The Court finds it more likely than not that at the time Agent Bourgeois swore out his affidavit, he knew that JPPD officers had gone to the location described by Adams, but he did not know whether the cellphone had been recovered.

AUSA Mark Baker appears to have been the first person within the prosecution to have hypothesized a connection between the 9:23 p.m. 911 call and the Becenti homicide. [Tr. 513] At the pretrial conference on August 8, 2013, AUSA Baker represented to the Court that he asked Agent Bourgeois to obtain recordings of 911 calls for the evening of the murder. [Tr. (Aug. 8, 2013) at 86] Agent Bourgeois recalled a "prompt" from AUSA Baker. [Tr. at 444] He

---

[5] Most notably, Officer Tafoya knew from a prior contact that the victim carried a backpack. [Tr. at 278-79] His Supplemental Report states that Adams found the cellphone in the victim's 'purse/bag," presumably a verbatim transcription of what Adams told him. In contrast, the Affidavit refers to the victim's "backpack," suggesting that this information came from Officer Tafoya's oral reports to Chief Toya rather than the Supplemental Report.

also recalled visiting the SCRECC in June 2013 to pick-up copies of CAD reports and recordings of December 28, 2011, 911 calls. [Tr. at 443]  Thereafter, in a June 13, 2013 email (after receiving the recording and the CAD reports) AUSA Baker advised Agent Bourgeois, "I listened to it, and I had a question:  Can we look at the phone number referenced on the CAD sheet to see if it ties back to any of the players in the case."  [Ex. 18] Although Agent Bourgeois knew at the time that he could take the 911 caller's phone number from the CAD report and plug the number into a database to determine the identity of the caller's service provider, he did not follow up AUSA Baker's inquiry.[6] [Tr. 516]

On July 31, 2013, Agent Bourgeois interviewed Clint Sando, the Jemez Pueblo tribal official who made the 911 call after tribal officials discovered the victim's body inside Defendant's home.  The interview took place at the Santa Ana Pueblo Police Department.[7] [Tr. at 449-51] At the meeting, Agent Bourgeois was accompanied by AUSAs Baker and Niki Brito-Tapia.  In a Dickensian coincidence, Officer Tafoya, who had left the JPPD in July 2012 and subsequently been hired by the Santa Ana Pueblo Police Department, was working in an office just down the hall from the office where Mr. Sando was being interviewed. [Tr. at 257] Officer Tafoya overheard enough of the interview to realize that it concerned the Becenti homicide. [Tr. 257, 261-62] Officer Tafoya introduced himself to Agent Bourgeois and AUSAs Baker and Brito-Tapia and told them about taking Rodney Adams' statement and recovering the victim's phone. [Tr. at 259-60]  Acting on the information provided by Officer Tafoya, Agent Bourgeois phoned the JPPD to request anything connected to Rodney Adams. [Tr. at 329]  Agent Bourgeois and AUSAs Baker and Brito-Tapia drove to the JPPD.  When Agent Bourgeois and the AUSAs

---

[6] Agent Chavez testified that once the provider's identity is known, the provider can be subpoenaed "to see who the subscriber is."  [Tr. at 411-12]
[7] Agent Bourgeois testified that this arrangement was for Mr. Sando's convenience, but he could not recall how meeting at Santa Ana Pueblo was more convenient for Mr. Sando, who had business in Albuquerque that day. [Tr. at 519, 526]

arrived at the JPPD, Criminal Investigator Ray Soto presented them with the cellphone and a bundle of documents comprising Officer Tafoya's December 29, 2011 Report of Rodney Adams's arrest, the December 29, 2011 Supplemental Report, a December 28, 2011 report of Officer Shendo's response to the 911 call by tribal officers, the property inventory forms for the cellphone and the recording of Rodney Adams' statement, a compact disc of Rodney Adams's statement to Officer Tafoya, and photographs taken by Officer Shendo documenting the recovery of the cellphone. [Ex.25]  Agent Bourgeois took custody of the cellphone. As of July 31, three members of the prosecution—Agent Bourgeois and AUSAs Baker and Brito-Tapia—knew that the victim's cellphone had been recovered by the JPPD and turned over to the United States.

At some point between August 1 and August 5, 2013, Agent Bourgeois found a compatible charger for the cellphone in a drawer at his home. [Tr. at 461]  He charged the phone, turned it on, and scrolled through the record of phone calls, noting the record of a 911 call made from the phone on the evening of December 28, 2011.  At this point, he belatedly associated the cellphone with the CAD report of the 9:23 p.m. 911 call. [Tr. at 461]  He  notified the AUSAs about his discovery of a possible connection between the CAD report of the 9:23 p.m. 911 call and the victim's cellphone. [Tr. at 462]

On Wednesday, August 7, 2013—a week after he obtained the cell phone from the JPPD, and with trial scheduled to start on August 14, 2013—Agent Bourgeois assigned to Agent Leroy Chavez the task of downloading information from the cellphone, [Tr. at 390, 391-92] even though Agent Chavez had no special expertise with cellphone technology. [Tr. at 398] Agent Chavez attempted to download the contents of the cellphone, but was unable to use the available software to download the data. As an alternative to downloading, Agent Chavez scrolled through the records of phone calls and text messages for December 28, 2011, taking a photo of each

record as it appeared on the cellphone's display.  One of the screenshots captures a record of a 911 phone call at 9:10 p.m. on December 28, 2011. [Ex. 35, p. 14 of 60]  Either Agent Chavez or Agent Bourgeois alerted the AUSAs about the information recovered from the victim's cellphone.  [Tr. at 460]

Although the recording of the 911 call had been disclosed to the defense in June 2013 in the course of discovery, it had not been designated as an exhibit.  Sometime on August 7, 2013 AUSA Baker contacted defense counsel to let counsel know that the United States intended to use the 911 recording as an exhibit. [Tr. (Aug. 8, 2013) at 76-78] Around noon on August 7, 2013, the prosecution filed a Third Amended Exhibit List [Doc. 108], which for the first time included as an exhibit a recording of a December 28, 2011 911 call.

The next day, Thursday August 8, 2013, the Court convened a final pretrial hearing. That hearing had been previously scheduled pursuant to notice given on August 2, 2013. [Doc. 99] After addressing a number of pretrial matters and evidentiary objections, the Court inquired whether there were other matters to be addressed. [Tr. (Aug. 8, 2013) at 72]  Defense counsel responded that "[w]hat we need to discuss is, today [sic] the government filed an amended exhibit list, to list Exhibit 234, which is a 911 telephone call.  And we would seek to exclude that, also, for failure to provide discovery and because it requires expert testimony that leaves us caught by surprise and unaware." [Tr. (Aug. 8, 2013) at 72]  AUSA Baker replied that the United States had received the recording of  911 call in June of 2013 and had promptly provided it to the defense.  Defense counsel countered, arguing that "[w]hat caught us by surprise is that this is now going to be an exhibit."[8]

---

[8] The Court had previously set a deadline of May 15, 2013 for exchanging exhibit lists.   Under the Court's standing trial preparation instructions, a copy of which was attached to the Court's Notice of Jury Selection and Trial [Doc. 26], the United States was required to file a written motion seeking leave to add the 911 call.  As of August 8, 2013, the United States had not sought leave to add the 911 call as an exhibit.

In arguing that the United States had acted with reasonable diligence, AUSA Baker made the following representation to the Court:

> But until [Agent Bourgeois] had physical custody of the cellphone, which he had no way to know that Jemez Pueblo had custody of, *given their repeated requests to receive it*, he couldn't draw that connection until yesterday, at which point he called me, at which point I called [Federal Public Defenders] Mr. Fooks and Mr. Pori.

[Tr. (Aug. 8, 2013) at 85 (emphasis added)].

The Court directed the parties to submit briefs addressing the timing of the United States' designation of the recording of the 911 call.  In its brief, the United States represented that "[u]nknown to the FBI until July 31, 2013, the Jemez Police Department had recovered the victim's cellular telephone the day after she was murdered, but had not turned it over with the other evidence related to the case." [Doc. 118 at 4 (emphasis added)].  The United States further represented that "[t]he victim's phone and other evidence was tagged under [Rodney Adams'] tribal case number rather than Yepa's." [Doc. 118 at 4 n.1]

The Court is not persuaded by the United States' attempt to blame the JPPD for the prosecution's late disclosure of the 911 call's connection to the Becenti homicide.  At most, the JPPD can be criticized for not asking Agent Bourgeois if the FBI wanted the evidence it had collected.  As noted above, the JPPD had associated the 911 call with the homicide by December 29, 2011, and had provided Agent Bourgeois with a copy of the CAD report of the 911 call, which included Ms. Becenti's phone number. [Ex. 14]  The CAD of the 911 call was accompanied by the CAD report of the 911 call made by responding tribal officials, [Ex. 15] a circumstance that should have alerted Agent Bourgeois to the fact that the two calls were related.  By December 30, 2011, the JPPD had identified Rodney Adams as a witness to the sexual assault and had recovered Ms. Becenti's cellphone, which was logged into the evidence room under the

12

CAD number of the homicide. By December 30, 2011, Chief Toya had informed Agent

Bourgeois that JPPD officers had  gone to recover the cellphone.  Agent Bourgeois did not

follow up this information with the obvious question:  Did the officers recover the cellphone?

      The JPPD was a small police department, with a "very small" evidence room  [Tr. at 338]

and the Becenti homicide was a major case for the JPPD. As a practical matter, C.I. Soto was the

JPPD evidence section.[9]  Unbeknownst to the FBI, on January 2, 2012, C.I. Soto retrieved the

cellphone from the evidence locker, and logged it into the evidence room under the CAD number

for the Becenti homicide.  [Doc. 196-1] The cellphone was accompanied by a Property

Inventory/Evidence Form using the CAD number of the Becenti homicide [Doc. 196-1] C.I. Soto

entered the cellphone on his evidence spreadsheet under the CAD for the Becenti homicide. [Ex.

43]  C.I. Soto knew of the connection of the phone to the Becenti homicide, [Tr. at 317-18] and

would have known where to find the phone within the JPPD's evidence room because he was the

person who placed it there. [Tr. at 318]  A request for the victim's phone at any time subsequent

to January 2, 2012 would have resulted in the immediate production of the phone by the JPPD,

exactly as occurred on July 31, 2013 in response to Agent Bourgeois' first, and only,  request for

the phone. The JPPD did not produce the cellphone prior to July 31, 2013 because the Agent

never requested it. [Tr. at 340; 512] The United States' representation to the Court that the

prosecution repeatedly asked for the cellphone was untrue.

      The prosecution's representation that the victim's cellphone had been mistagged was

based on the fact that in response to Agent Bourgeois' request for "any documents and anything

else associated with Rodney Adams," [Tr. at 456]  C.I. Soto produced a mixed "bundle" of

documents, including documents relating to the tribal charges against Rodney Adams and other

---

[9] C.I. Soto and Chief Toya were the only persons with keys to the evidence lockers and the evidence room.  [Tr. at 303] C.I. Soto personally logged each item of evidence into the evidence room. [Tr. at 303] He also maintained a spreadsheet for tracking the evidence.  [Tr. at 306]

documents relating to the Becenti homicide.  These documents appeared to Agent Bourgeois to "all go together," leading Agent Bourgeois to assume that "all of this information was associated with, somehow, the recordkeeping concerning Rodney Adams."  [Tr. at 457]  At the evidentiary hearing, Agent Bourgeois conceded that calling the cellphone "mistagged" was a misuse of the term.[10] [Tr. at 457-58]

The low priority given to the victim's cellphone and the CAD of the 9:23 p.m. call by Agent Bourgeois explains why it took until August 7, 2013 for the prosecution to connect the 911 call and the Becenti homicide.  As noted above, within one day of the homicide the JPPD had provided Agent Bourgeois with a copy of the CAD report for the 911 call, which included the caller's phone number.  Within two days of the homicide, the JPPD had discovered the connection between Rodney Adams and the homicide. By that point, it was apparent that the recovery of the cellphone at the location described by Rodney Adams would corroborate Rodney Adams' statement.  Agent Bourgeois took no action to obtain the cellphone. Early in the investigation, Agent Bourgeois learned that Tom Collateta was the victim's boyfriend.  [Tr. at 495] When he interviewed Mr. Collateta he asked Mr. Collateta for the victim's phone number, but Mr. Collateta was too distraught by the news of Ms. Becenti's murder to answer. [Tr. at 67] Agent Bourgeois did not follow up with an inquiry at a later date because he did not view the victim's phone number as a priority at that time**.** [Tr. 442]  In June 2013, AUSA Baker asked Agent Bourgeois to determine whether there was a connection between the 911 call by a distressed woman and the Becenti homicide.  Agent Bourgeois failed to follow through on this request, other than to "eye ball" the phone number shown on the CAD report. [Tr. at 446]  Once

---

[10]AUSA Baker did not testify at the September 2013 evidentiary hearing, so the Court does not have the benefit of his recollection of the basis for his representation to the Court on August 8, 2013 that the FBI had made "repeated requests" to the JPPD for the victim's cellphone, or the United States' representation in its August 9, 2013 Response that "[t]he victim's phone and other evidence was tagged under R.A.'s tribal case number rather than Yepa's."

again, the phone call was not considered a priority. [Tr. at 448] Agent Bourgeois admitted that he

never asked anyone at the JPPD to double-check to insure that he had all the evidence in the

case.  [Tr. at 512] Were it not for the fortuitous crossing of paths of Agent Bourgeois and

AUSAs Baker and Tapia-Brito with Officer Tafoya at Santa Ana Pueblo on July 31, 2013, it is

likely that the United States would not have made the connection between the 911 call and the

homicide. And even with the phone in hand as of July 31st and the trial scheduled to start on

August 14, 2013, Agent Bourgeois waited until August 7, 2013 before assigning Agent Chavez

the task of downloading the phone data.

Despite these errors of omission, the Court expressly rejects Defendant's argument that

the prosecution withheld evidence connecting the 911 call to the Becenti homicide in order to

obtain a tactical advantage over the defense.  Oversight is not bad faith. The Court concludes that

although the United States can be criticized for not making the connection between the 911 call

and the Becenti homicide prior to the week before trial, the United States did not knowingly

suppress evidence of the connection to obtain a tactical advantage.

"A court can conclude that a late disclosure was unjustifiable, even if it was not in bad

faith." *United States v. Combs*, 267 F.3d 1167, 1179 (10th Cir. 2001).  Indeed, as noted above,

in *Wicker* itself, the Court of Appeals upheld the sanction of exclusion notwithstanding the

absence of a finding of bad faith.  In *Wicker*, the delay was due to the failure of the government's

expert witness to forward a report to the prosecutor, coupled with the prosecutor's failure to

follow up his initial request for the report. 848 F.2d at 1061.  The Court finds the fault of the

government in the present case to be similar in degree to that of the government in *Wicker*.

### 3.      Prejudice to the Defendant

The United States' delay in designating the 911 recording seriously disrupted defense

preparations for trial, which was to begin on August 14, 2013. *Cf. United States v. Adams*, 271 F.3d 1236, 1244 (10th Cir. 2001) (noting prejudice to government from defendant's designation disclosure of psychologist three days before trial).  The 911 recording is very disturbing and required the defense to devise a strategy for countering the emotional impact of the recording on the jury.  Although the Court does not find the substance of the recording necessarily inconsistent with Defendant's theory that Rodney Adams murdered the victim,[11] the recording, if properly authenticated, would corroborate Rodney Adams' testimony that Defendant sexually assaulted the victim.  The belated designation of the 911 call required the defense to shift trial preparation resources to preparing a challenge to the admission of the recording:  *e.g.*, interview the authenticating witnesses,[12] consult an expert as to the significance of the CAD report's description of San Ysidro as the location of the call and the different times for the call captured by the SCRECC's system and the victim's cellphone.  The untimely disclosure made it difficult, if not impossible, for the defense to have the recording examined by an audio expert if the trial was held as scheduled.

  The Court finds that the defense was not at fault in failing to recognize the significance of the 911 recording.  The prosecution disclosed the recording after the May 15, 2013 deadline for exchanging exhibit lists.  Since the 911 recording was not listed in the United States' exhibit list and was not accompanied by a Rule 45(b) motion seeking leave to add it as an exhibit, the defense was justified in assuming that the 911 call was not a significant item of evidence.

---

[11] As the Court understands Defendant's theory of the case, he claims to have passed out and to have been unconscious at the time that Rodney Adams fatally assaulted Ms. Becenti. The theory that Defendant passed out at some point during the evening of December 28, 2011 is supported by the opinion of an FBI forensic scientist who estimated that Defendant's BAC could have been as high as .333 at 9:00 p.m. [Defendant's. Trial Ex. B] At the evidentiary hearing, Agent Bourgeois described the 911 recording as "a recording of an assault that happened *before* the homicide." [Tr. at 518 (emphasis added)]  Thus, even if the 911 recording were to be admitted, the defense would still be in a position to argue that Defendant was unconscious at the time that Rodney Adams inflicted the fatal injury.

[12] On August 9, 2013, the United States designated Monte Roberts and Kim Kronowit as witnesses. Mr. Roberts is the manager of the SCRECC;  Ms. Kronowit was the  911 operator who answered the 9:23 p.m. 911 call.

The Court is not persuaded by Defendant's theory that the defense was prejudiced by the loss of cellphone tower information pinpointing the position of the victim's cellphone throughout the evening of December 28, 2013.  The ostensible discrepancy between the location information on the CAD report of the 911 call and the location of Defendant's residence has been explained,[13] and Defendant has not made a colorable argument that the homicide took place at some location other than Defendant's residence.  Indeed, defense counsel conceded that the location of the murder is not in dispute. [Tr. (Aug. 8, 2013) at 31]

**4.      Feasibility of Curing the Prejudice to the Defense with a Continuance**

As of August 11, 2013, (the date that the Court entered its Order) the Court had listened to the recording of the 911 call.  The Court was aware of the United States' representation that the recording came from the SCRECC and that the prosecution intended to call two previously undisclosed witnesses to authenticate the recording as a record of the SCRECC. The Court was aware that the location information provided by the SCRECC involved some form of anomaly that made it appear that the phone call came from a location miles away from Defendant's residence. [Doc. 118 at 3]  The Court knew that there was a discrepancy between the time of the call shown on the records of the SCRECC and the victim's cellphone.  As of August 11, 2013, the United States had not explained to the Court how it intended to identify the voices on the recording as those of Lynette Becenti and Defendant.

It was obvious to the Court that defense counsel would not have a fair opportunity to meet the new evidence if the trial began as scheduled on August 14, 2013.  Fairness to Defendant required that defense counsel be given a reasonable opportunity to investigate the

---

[13] The Court takes judicial notice of the fact that the village of San Ysidro is located to the south and west of Jemez Pueblo.  The CAD report of the 9:23 p.m. 911 call indicates that the cell tower associated with the call was located in San Ysidro and that the 911call utilized the northeast sector of that tower—the sector facing toward Jemez Pueblo.  Monte Roberts explained that with cellphones provided with a lower level of service, the SCRECC obtains only "Phase One" location information, which is limited to the location of the cell tower utilized in the call.

provenance of the 911 recording. The question of a continuance was complicated by the fact that

the case was to be tried by the Honorable Alan B. Johnson from the District of Wyoming, sitting

by designation. Resetting the case for trial would have required either accommodating Judge

Johnson's schedule or that of the presiding judge, as well as the schedules of the prosecutors,

defense attorneys and witnesses (including several expert witnesses). The Court finds that a fair

estimate of the time added by a continuance would have been four to eight weeks.

A continuance of four to eight weeks would have cured the prejudice to Defendant's

ability to defend arising from the late disclosure of evidence connecting the 911 call to the

homicide.

However, prejudice to Defendant's ability to defend against the charges is not the only

form of prejudice to Defendant of concern to the Court in this case:

> [T]he constitutional right to a speedy trial
> has universally been thought essential to protect at least three basic
> demands of criminal justice in the Anglo-American system:  "[1] *to
> prevent undue and oppressive incarceration prior to trial*, [2] to minimize
> anxiety and concern accompanying public accusation and [3] to limit the
> possibilities that long delay will impair the ability of an accused to defend
> himself."
> Each of these is an important interest of a defendant in a criminal case.
> As for the first on the list, it is clear that the disadvantages for the accused
> who cannot obtain his pretrial release are most serious. "The time spent in jail
> awaiting trial has a detrimental impact on the individual.  It often means loss of a
> job; it disrupts family life; and it enforces idleness. Most jails offer little or no
> recreational or rehabilitative programs. The time spent in jail is simply dead
> time."

5 Wayne R. LaFave, *et al.*, *Criminal Procedure* § 18.1(b) (3d. ed 2007) (footnotes omitted)

(quoting *Smith v. Hooey*, 393 U.S. 374 (1969) and *Barker v. Wingo*, 407 U.S. 514 (1972))

(emphasis added).

As of August 11, 2013, Defendant had been continuously confined without bail since

December 29, 2011.  Although earlier in the proceedings Defendant asked the Court to grant a

60-day continuance [Doc. 27] and to declare the case complex so that he could prepare for trial [Doc. 29], as of August 11, 2013, Defendant was prepared to proceed to trial on August 14, 2013, but for the United States' belated designation of the 911 recording and two authenticating witnesses. The conflict between Defendant's interest in a fair trial and his interest in avoiding weeks of additional pretrial incarceration was due to the United States' lack of diligence in preparing its case, not culpable conduct by the defense.  *Cf. United States v. Hastings*, 847 F.2d 920, 923 (1st. Cir. 1988) (characterizing as "particularly invidious" with respect to a defendant being detained before trial the government's practice of withholding discovery required by local rule to force a defendant to "either forgo discovery to which he was entitled or . . . file a motion to obtain it, thus stopping the speedy trial clock. . . .").  In those cases where the defendant is free on bail, a preferred response to the prosecution's untimely disclosure of evidence may very well be a continuance.  But that is not necessarily always the case where the defendant is being held without bail. In a case such as the one at bar, for a defendant who is detained, a continuance requires that he endure additional pretrial incarceration as the remedy for the *prosecution's* negligence.[14] "[A] defendant confined to jail prior to trial is obviously disadvantaged by delay. . . ." *Barker*, 407 U.S. at 527.

The untimely designation of the 911 recording and authenticating witnesses seriously prejudiced Defendant's ability to defend against the charges brought against him if the trial were to have gone ahead as scheduled.  A continuance would have enabled defense counsel to respond to the 911 recording and the additional witnesses, but would have unfairly required Defendant,

---

[14] "Post-conviction there is less fear that an innocent individual is being improperly subjected to deprivation inherent in incarceration." *Burkett v. Fulcomer*,  951 F.2d 1431, 1443 (3d. Cir. 1991) (quoting *Burkett v. Cunningham*, 826 F.2d 1208, 1231 (3d Cir. 1987)  (Garth, J., concurring)).  A trial court analyzes prejudice at a time when the defendant is still presumed innocent and with the knowledge that if the defendant is acquitted he will never be compensated for the additional restraint on his liberty caused by the government's unjustified delay AUSA Baker's offer to "eat sanctions" as an alternative to exclusion [Tr. (Aug. 8, 2013 at 88)] offered no comfort to Defendant.

who was being held without bail, to suffer an additional four to eight weeks of pretrial incarceration.

## 5.    Other Concerns

As noted above, the *Wicker* factors are non-exclusive.  The Court has given consideration to the following additional circumstances.

The United States has held out the recording as "highly probative—so much so that the United States believes that granting [Defendant's] motion [to exclude] will preclude just adjudication of this case."  [Doc. 118 at 1]  Having listened to the recording, the Court is aware of its powerful emotional impact.  Substantively, it corroborates Adams' statement that Defendant sexually assaulted the victim, requiring the defense to make the difficult argument that "Defendant may have raped the victim, but he did not commit the rape that resulted in her death."  That said, the 911 recording does not "make or break" the United States' case.  Even without the 911 call, the United States has a strong case, which includes the eyewitness testimony of Rodney Adams,[15] the bloody condition of Defendant's person and home, and fingerprint, serological and DNA evidence.

Exclusion of the 911 recording will not preclude "a just adjudication of this case." *See Red Elk*, 185 Fed. Appx.  at 724 (noting with approval trial court's consideration of the effect of exclusion on the government's case).

As of Sunday, August 11, 2013, the jury had not yet been impanelled.  However, the

---

[15] During the August 8, 2013  hearing, the parties advised the Court that Rodney Adams had asserted his Fifth Amendment privilege against self-incrimination. The Court has subsequently learned that on August 9, 2013, the prosecution obtained the approval of the USAGO to grant Adams immunity pursuant to 18 U.S.C. §§ 6001-6003. [Doc. 183-1] This fact undercuts Defendant's argument that the United States needed a continuance due to Rodney Adams' assertion of his privilege against self-incrimination. [Doc.  183-1]  Given that by August 9, 2013, the prosecution had obtained authorization to immunize Adams and compel his testimony, the Court views the prosecution as having been less than candid when it used Adams' assertion of his Fifth Amendment privilege to argue in its August 9, 2013 Response that the United States had "lost the testimony of an eyewitness to Yepa assaulting the victim." [Doc. 118 at 12]

jurors had been summoned and would have made arrangements affecting work, childcare and transportation, among other matters.  As the Court knew, continuing the trial would render for naught these personal sacrifices by the jury panel. As the Court observed in its Order of August 11, 2013, the Court and its staff had devoted many hours in preparing the case for trial beginning August 14, 2013, diverting court resources from other time-sensitive matters.  A continuance would have squandered the August 2013 trial setting, Judge Johnson's preparations for trying the case beginning on August 14, 2013, the Court's efforts to prepare the case for trial beginning on August 14, 2013, and the accommodations to their normal schedules made by the jurors.

**CONCLUSION**

Having considered the *Wicker* factors and other relevant circumstances, the Court concludes that the balance of circumstances existing on August 11, 2013 supported the exclusion of the 911 recording so that the trial could go forward as scheduled.  The Court further concludes that exclusion of the 911 recording so that the trial could proceed as scheduled was the least severe response to the United States' untimely designation of the 911 recording available to the Court that would have accomplished full compliance with the Court's scheduling orders.

**WHEREFORE, IT IS HEREBY IS ORDERED** that Defendant's Motion to Exclude Evidence [Doc.115] is **granted**.

So Ordered this 31st day of December, 2014.

_____
M. CHRISTINA ARMIJO
Chief United States District Judge

21